IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KENNETH CAPOGRECO, et al.,

          Plaintiffs,                    No. CIV S-00-1951 LKK GGH P

     vs.

R. SANDHAM, et al.,

          Defendants.                    ORDER &
_____/         FINDINGS AND RECOMMENDATIONS

Introduction/Background

          Plaintiffs, state prisoners proceeding pro se, seek relief pursuant to 42 U.S.C. § 1983.  There are two matters pending before the court.  They are the previously vacated motions for partial summary judgment as to plaintiff Capogreco and for partial summary judgment as to plaintiff Johnson, re-noticed and re-submitted by order filed on October 13, 2004, brought by defendants Sandham, Gilkes, Malan, Lett, Parks, Castro and Tristan.  Plaintiffs filed a joint (inapposite) opposition[1] to the previously vacated motions, filed on July 17, 2003 and July 18, 2003, respectively, on August 1, 2003 and then, pursuant to the order filed on October 1, 2003, \\\\\

_____

     [1]See Order, filed on October 1, 2003.

1

1  filed another opposition, on December 4, 2003.[2]  In its October 13, 2004 order, the court noted

2  that plaintiff Johnson had indicated that the court could proceed to adjudicate the motion for

3  partial summary judgment as to him based on his previously submitted opposition,[3] and in the

4  same order, granted plaintiff Capogreco's request for the court to take judicial notice of the

5  exhibits submitted in opposition to defendants' March 18, 2002 motion to dismiss, in opposition

6  to the defendants' motion for partial summary judgment as to him.  On October 21, 2004,

7  defendant Maurino renewed and re-noticed her motions for partial summary judgment as to each

8  plaintiff brought by defendant Maurino, pursuant to the court's orders filed on January 28, 2004

9  and October 13, 2004.[4]  Defendant Maurino's motion is directed at the claims made by plaintiff

10  Johnson; plaintiff Capogreco makes no allegation against her with respect to any constitutional

11  deprivation affecting him.  On November 17, 2004, plaintiffs filed their opposition to defendant

12  Maurino's motion.

13        The court granted plaintiff Caprogreco additional time to file exhibits and/or

14  affidavits in support of his opposition to defendants' motion for summary judgment or to

15  demonstrate that he was unable to do so, both of which he failed to do.  See Orders filed on

16  January 28, 2004 and October 13, 2004.  On August 5, 2005, defendants filed their response to

17  defendants' motion for summary judgment as well as to defendants' July 22, 2005 response to

18  this court's order, filed on July 5, 2005.  By order filed on July 5, 2005, this court ordered

19  defendants to show proof, within 30 days, that plaintiff Johnson had been provided access to

20  plaintiffs' legal property relevant to action and access to the law library.  Upon defendants'

21  showing proof of such access, if plaintiff elected to proceed on a revised or amended opposition,

22  _____

23        [2]Plaintiffs were also granted an extension of time by order filed on November 7, 2003.

24        [3] Order, filed on October 13, 2004, p. 2, citing plaintiff Johnson's February 19, 2004
      Objections to the January 28, 2004 Findings and Recommendations.

25

26        [4]  Defendant Maurino's renewed notice attached as Exhibit A, her responses to plaintiffs'
      first set of interrogatories, which had been served on August 5, 2003.

1   plaintiff Johnson was directed to file his opposition to the pending motion for partial summary

2   judgment as to himself within 30 days, along with any exhibits.  Alternatively, upon defendants'

3   showing proof of access to the relevant legal property and to the law library, plaintiff could

4   choose to proceed solely on the previously submitted opposition and on the exhibits to plaintiffs'

5   May 4, 2002[5] opposition to defendants' prior motion to dismiss, which constitute the opposition

6   and exhibits upon which plaintiff Capogreco rests.

7            Should defendants have failed to make the requisite showing, defendants were

8   informed that their motion for partial summary judgment as to plaintiff Johnson would be

9   vacated permanently.  By filing dated July 22, 2005, the defendants have made an adequate

10  showing that plaintiff Johnson was afforded access to the law library for the relevant periods

11  following the renewed notices of motions for partial summary judgment as to each plaintiff.

12  Notice was renewed by the court on October 13, 2004 as to all defendants but defendant

13  Maurino, who filed a renewed notice of her motions for partial summary judgment as to each

14  plaintiff on October 21, 2004.  However, defendants showing with respect to plaintiff Johnson's

15  access to the relevant legal property raises more questions than it answers.

16           Defendants inform the court again that plaintiff Johnson was placed in Salinas

17  Valley State Prison (SVSP) Administrative Segregation (Ad Seg) on May 31, 2003.[6]  Response,

18  p. 1.  Although limitations are placed on the type and amount of property that inmates in Ad Seg

19  can access, inmates may request up to two cubic feet of legal materials if he has a verified legal

20  deadline.  Response, p. 2, citing decl. of Pete Meza, SVSP Litigation Coordinator, in response to

21

22  _____

23           [5] The docket entry dates the opposition as having been filed on May 2, 2002, although the
    opposition appears to be date-stamped May 4, 2002.

24           [6] Plaintiff Johnson allegedly had repeatedly stabbed a wheelchair-bound inmate on May
    30, 2003.  See June 1, 2003 Crime Incident Report, Exhibit A to defendants' October 30, 2003
25  response to the court's order filed on October 1, 2003.  Actually, plaintiff Johnson, according to
    the declaration of Lt. W. Muniz, Exhibit 2 to the Oct. 30, 2003 response to the Oct. 1, 2003
26  order, was not placed in Ad Seg until June 4, 2003, when space became available.

court's October 1, 2003 order, Exhibit F,[7] p. 2.[8]   According to SVSP Ad Seg Lt. W. Muniz's

July 11, 2005 and SVSP Senior Librarian H. Burk, plaintiff was permitted library access and

access to his legal property many times while in Ad Seg.  Response, Muniz decl., Exhibit A, ¶ 4;

Burk decl., Exhibit B, ¶ 2.  Sr. Lib. Burk avers that plaintiff had Priority Legal User (PLU) status

from October 14, 2003 through December 7, 2004 and from February 3, 2004 through February

17, 2004.  Burk decl.,  Exhibit B, ¶ 5.  Specifically, Burk avers that plaintiff Johnson actually

received access to the library on Oct. 14, 2003, Oct. 29, 2003, Nov. 12, 2003, Nov. 19, 2003;

Nov. 26, 2003, Dec. 2, 2003, Dec. 5, 2003 Dec. 10, 2003, Dec. 17, 2003, Jan. 21, 2004, Feb. 3,

2004.  Id., ¶ 6.  Further, according to Burk, plaintiff Johnson received law library paging services

on Dec. 8, 2003 and on Dec. 30, 2003.  Id., ¶ 7.  Finally, on Nov. 4, 2003 and on Feb. 10, 2003,

plaintiff is alleged to have refused law library access which he had been granted.  Id., ¶ 8.

According to Muniz, plaintiff Johnson did not submit any inmate appeals regarding any legal

issues.  Muniz decl., Exhibit B, ¶ 11.

   While defendants make an adequate showing that plaintiff Johnson was allowed

access to the prison law library for the relevant period following the October 13, 2003 and

October 21, 2003 re-notice of the pending motions, they do not make a definitive showing that

plaintiff Johnson was allowed access to the legal property relevant to this case which would

include both of the plaintiffs' legal property, an objection plaintiff Johnson raised in his filing of

Nov. 17, 2003, and a failing which the court had intended to cure by its order filed on January 28,

2004.  Instead, defendants merely demonstrate that plaintiff was subject to restrictions in Ad Seg,

refer generally to regulations applicable as to the amount of property Ad Seg inmates are allowed

under certain conditions, and conclusorily assert that plaintiff was allowed access to his legal

[7] Excerpt of SVSP Operational Procedure 29 B, procedures applicable to Ad Seg unit inmates.  Exhibits F and G to the Oct. 30, 2003 response to the Oct. 1, 2003 order.

[8] Defendants incorrectly refer to Exhibit G; the text referencing the amount and conditions upon which legal materials may be issued to an Ad Seg inmate.  Response, p. 2.

1   property on "many occasions."   Neither of the declarants relied on by defendants (Muniz, Burk)

2   make any specific representation of when and to what legal property plaintiff was allowed access.

3   Unsurprisingly, plaintiff Johnson refutes defendants' representation that he has been, in

4   particular, allowed adequate access to his relevant legal property.  Plaintiff's reply, filed on

5   August 5, 2005.  Plaintiff contends that it takes 30 to 60 days for a request for access to his legal

6   property to be processed, that most of the requests were not answered and that some concerned

7   unrelated legal matters that he has pending.  Id., p. 2.   The court simply cannot proceed with this

8   defendants' showing on defendants' motion for partial summary judgment as to inmate Johnson,

9   notwithstanding his purported wish to proceed even though he argues that defendants have not

10  complied with this court's order.  Id., p. 3.  Plaintiff Johnson seeks to proceed only on his own

11  terms and the court, of course, cannot be so limited.  It appears that the undersigned has little

12  choice but to schedule an evidentiary hearing to resolve the question of the access to the relevant

13  legal property allowed by parties who are not defendants, SVSP prison staff, that plaintiff

14  Johnson has been afforded for the purpose of obtaining exhibits and/or affidavits in support of

15  his opposition to defendants' motion for partial summary judgment as to him.  Defendants have

16  made an effort to respond to the court's July 5, 2005 order, so the court will not vacate the

17  motion for partial summary judgment as to plaintiff Johnson permanently, but must do so at this

18  time and can only proceed herein to adjudicate the motion for partial summary judgment as to

19  plaintiff Capogreco.

20  Amended Complaint

21       The court hereby takes judicial notice of its Findings and Recommendations, filed

22  on January 6, 2003,[9] and in its Findings and Recommendations, filed on January 28, 2004,[10] and

23  sets forth the summary of the operative complaint as contained therein at pages 1-3:

24

25       [9] Adopted by Order filed on March 19, 2003.

26       [10] Adopted by Order filed on September 20, 2004.

5

This action is proceeding on an amended complaint, filed on March 7, 2001; the original complaint was filed on September 8, 2000. The gravamen of plaintiffs' extensive amended complaint is that they have been deprived of adequate medical care, including dental and psychiatric care, in violation of their rights under the Eighth Amendment. Plaintiff Capogreco was not treated for possible seizures and a degenerative back and foot problem and was not issued proper authorization for lifts he needed from defendants High Desert State Prison (HDSP) acting Chief Medical Officers (CMO) Sandham and Gilkes to correct his lower back and mobility problems for over a year. Amended Complaint (Am. Cmpl.), pp. 1-3. Plaintiff Johnson, a brittle diabetic, has been told by defendants Sandham and Gilkes that he needed a special diet to control blood sugar levels but they have not prescribed any such diet. Am. Cmpl., pp. 1-3. Defendants Sandham and Gilkes have also refused to order blood tests needed by plaintiff Johnson or authorized his access to a glucometer. Id., at pp. 2-3.

Defendant Malan, Health Care Manager at HDSP, as well as a dentist, has not addressed plaintiffs' medical problems properly because he is not qualified as a dentist to make the medical evaluations needed by plaintiffs and have jeopardized plaintiffs' lives. Am. Cmpl., pp. 3-4.

Defendant Lett, a "psychiatrist"[11] at HDSP, having prescribed Depakote for plaintiff Capogreco, refused to renew the prescription, causing plaintiff to suffer three seizures due to withdrawal. Am. Cmpl., p. 4. Lett also did not order blood work to see if the Depakote may have damaged plaintiff Capogreco's liver, failed to obtain plaintiff's informed consent prior to prescribing the Depakote, and caused plaintiff stress by an effort "to incite a physical and verbal confrontation with plaintiff Capogreco." Id., pp. 4-5.

Defendant Maurino, dietician at HDSP, refuses to issue special diets to mainline diabetics. Am. Cmpl., p.5. Defendant Parks, D.D.S., a dentist at HDSP, has failed to provide plaintiffs with the routine dental care to keep minor problems from turning into major ones, causing them unnecessary pain and suffering. Id., at pp. 6 - 7.

Defendant Castro, the Warden at HDSP, has refused to make the necessary changes to ensure that inmates receive proper medical care. Am. Cmpl., p. 7. Defendant Tristan, C.D.C. Director, is responsible for insuring that inmates receive proper medical care; his failure to investigate problems and make necessary changes to medical treatment has resulted in unnecessary pain and suffering to

---

[11] Plaintiffs assert that defendant Lett has a Ph.D., not an M.D. Perhaps they meant to characterize him as a psychologist.

1    plaintiffs. Id., p. 8.

2    Plaintiffs, inter alia, also allege that HDSP improperly processes
     602 inmate appeals containing medical grievances in that prison
3    authorities either refuse to process the appeal at all, or, if the appeal
     does process beyond the informal level review, the inmate appeals
4    office makes no effort to enforce time constraints for staff
     response. Am. Cmpl., p. 10.  This results in inmates having to wait
5    for a year or more before resolution of the 602 appeal, during
     which time medical care has been denied. Id., p. 10.

6
     Plaintiffs seek injunctive relief as well as monetary damages.  Am.
7    Cmpl., pp. 22-23.

8         Plaintiffs' injunctive relief claims against the defendants employed at High

9    Desert State Prison, Sandham, Lett, Parks, Castro, Maurino, Gilkes and Malan, that is all but

10   those against C.D.C. (Chief Deputy) Director Tristan, have been dismissed pursuant to an order

11   filed on March 19, 2003, adopting the January 6, 2003 findings and recommendations, as

12   plaintiffs have been transferred from HDSP to Salinas Valley State Prison (SVSP).

13   Motion for Partial Summary Judgment as to plaintiff Capogreco

14        Because there are two plaintiffs in this action, defendants have brought a motion

15   for partial summary adjudication as to each, in seeking entry of summary judgment as to the

16   entire action in their favor.  However, as noted, the court will proceed to adjudication only of the

17   motion for partial summary judgment as to plaintiff Capogreco, proceeding on the only

18   remaining claims for relief, which are solely in the form of money damages.  Although the court

19   should not be compelled to cobble together plaintiff Capogreco's exhibits, the undersigned has

20   granted plaintiffs' request for the court to take judicial notice of the exhibits filed with their

21   opposition to the defendants' March 18, 2002 motion to dismiss.  See Order filed on October 13,

22   2004.  The court will also take judicial notice[12] of plaintiffs' exhibits filed on August 31, 2001 in

23   \\\\\

24

25        [12]  A court may take judicial notice of court records.  See Barron v. Reich, 13 F.3d 1370,
     1377 (9th Cir. 1994); MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United
26   States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

1   opposition to the defendants' original motion to dismiss on July 24, 2001.[13]  The court will

2   identify exhibits from the 2001 opposition as "2001 opp. exh." and from the May 2, 2002

3   opposition as "2002 opp. exh."

4   <u>*Legal Standard for Summary Judgment*</u>

5   　　　　Summary judgment is appropriate when it is demonstrated that the standard set

6   forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

7   there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

8   as a matter of law." Fed. R. Civ. P. 56(c).

9   　　　　Under summary judgment practice, the moving party always bears the initial

10  responsibility of informing the district court of the basis for its motion, and identifying those

11  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

12  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

13  of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).

14  　　　　"[W]here the nonmoving party will bear the burden of proof at trial on a

15  dispositive issue, a summary judgment motion may properly be made in reliance solely on the

16  'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>.  Indeed,

17  summary judgment should be entered, after adequate time for discovery and upon motion, against

18  a party who fails to make a showing sufficient to establish the existence of an element essential

19  to that party's case, and on which that party will bear the burden of proof at trial.  <u>See</u> <u>id.</u> at 322,

20  106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the

21  nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u>  In such a

22  circumstance, summary judgment should be granted, "so long as whatever is before the district

23  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

24  satisfied." <u>Id.</u> at 323, 106 S. Ct. at 2553.

25

26　　　　[13] This motion was vacated by order filed on February 4, 2002.

8

1       If the moving party meets its initial responsibility, the burden then shifts to the

2   opposing party to establish that a genuine issue as to any material fact actually does exist.

3   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356

4   (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing

5   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

6   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In

7   attempting to establish the existence of this factual dispute, the opposing party may not rely upon

8   the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

9   form of affidavits, and/or admissible discovery material, in support of its contention that the

10  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.

11  11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

12  might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

13  Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

14  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

15  evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool

16  v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

17      In the endeavor to establish the existence of a factual dispute, the opposing party

18  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

19  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

20  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

21  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

22  genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

23  56(e) advisory committee's note on 1963 amendments).

24      In resolving the summary judgment motion, the court examines the pleadings,

25  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

26  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

On May 25, 2001, the court advised plaintiffs of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

*Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an

10

injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense—a subjective standard— disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at 1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837, 114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at 1981.  However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

1    662 F.2d 1337, 1344 (9th Cir. 1981).

2         Moreover, a physician need not fail to treat an inmate altogether in order to violate

3    that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

4    1989). A failure to competently treat a serious medical condition, even if some treatment is

5    prescribed, may constitute deliberate indifference in a particular case. Id.

6         Additionally, mere delay in medical treatment without more is insufficient to state

7    a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766

8    F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is

9    no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing

10   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

11   1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends

12   to provide additional support for a claim of deliberate indifference; however, it does not end the

13   inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

14   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

15   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

16   the defendant." McGuckin, 974 F.2d at 1061.

17        Superimposed on these Eighth Amendment standards is the fact that in cases

18   involving complex medical issues where plaintiff contests the type of treatment he received,

19   expert opinion will almost always be necessary to establish the necessary level of deliberate

20   indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Thus, although there

21   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

22   treatment he received equated with deliberate indifference thereby creating a material issue of

23   fact, summary judgment should be entered for defendants. The dispositive question on this

24   summary judgment motion is ultimately not what was the most appropriate course of treatment

25   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

26   criminally reckless.

1    *Discussion*

2          Defendants aver that there remains no genuine issue of material fact in dispute

3    and that plaintiff Capogreco has not been subjected to any defendant's deliberate indifference to

4    plaintiff's serious medical needs care in violation of the Eighth Amendment, nor plaintiff stated a

5    claim for supervisory liability.  See Motion for Summary Judgment re: Capogreco (MSJC).

6          The Chief Medical Officer (CMO) at Salinas Valley State Prison, Dr. Charles Lee,

7    not a defendant, conducted a review of plaintiff Capogreco's medical history relevant to the

8    issues in this action.  MSJC, Exhibit A, Lee Declaration, ¶ 5.  Dr. Lee notes that plaintiff

9    Capogreco was transferred to High Desert State Prison (HDSP) on May 26, 1999 and was housed

10   there until he was transported to Salinas Valley State Prison (SVSP) on September 4, 2002.   Lee

11   Decl. ¶ 4.  At the time of his transfer to HDSP, Capogreco's medical history indicated that he had

12   Hepatitis C; lower back pain; one leg shorter than the other, a condition which required that he

13   have shoe lifts and special boot chronos; sinus and allergy problems; high blood pressure; bipolar

14   disorder; and the need for corrective lenses.  MSJC, p. 4, Lee Decl., ¶ 8.  Upon his transfer to

15   HDSP, medical staff conducted an intake screening of plaintiff Capogreco.  MSJC, p. 4, Lee

16   Decl., ¶ 9, Exhibit 1, Capogreco Medical Records (MR), pp. 145-146.   At that time, Capogreco

17   informed the intake registered nurse that he was not currently under a doctor's care for medical,

18   dental or psychiatric reasons; he was not taking medications and had no special health care needs,

19   and that he did not suffer from cough, fever, night sweats, or unexplained weight loss.  Id.

20         Plaintiff contends in his amended complaint that he "had a possible problem with

21   seizures and and a degenerative back and foot problem and needed to be seen by medical staff,"

22   which was not done.  AC, p. 1.  In his opposition, plaintiff does not indicate that he made any

23   reference to a seizure problem, but does state that he informed medical staff on intake that he was

24   under dental care and needed a tooth filled.  Opp., p. 2.  He also claims to have said that while he

25   was not currently receiving CCCMS medication, he was still part of the program and needed to

26   see a psychiatrist.  Id.  Defendants point out that the medical records indicate that plaintiff had

13

1  been discharged from the mental health treatment program he was on prior to his transfer to

2  HDSP.  MSJC, p. 5, Lee Decl., ¶ 12, MR, pp. 292, 389.  The intake form does record that

3  plaintiff had a short leg and lower back pain, needed shoe lifts, had an Ampicillin allergy which

4  would result in a rash, and had been taken off Depakote some three weeks earlier after being on it

5  for 90 days.  MSJC, pp. 4-5, Lee Decl., ¶ 9, MR, p. 145.  The form also indicates that plaintiff

6  claimed not to be suicidal, did not wish to hurt either himself or others and did not have a current

7  mental health problem.  MSJC, p. 5, Lee Decl., ¶ 9, MR, p. 145.  Plaintiff was referred to a

8  medical doctor within 72 hours.  Lee Decl., ¶ 9, MR, p. 146.   On the form itself, under "Special

9  Needs" the words "Medical - Refer To" and "Mental Health - Refer To" are circled, although no

10  specific health care provider is named, and the referral is marked as to occur within 72 hours.

11  MR, p. 146.  Defendants point to no exhibit which indicates that plaintiff was, in fact, seen

12  within 72 hours by any HDSP medical staff.

13          <u>Defendant Parks</u>

14          Plaintiff disputes HDSP's contentions with respect to his representations upon

15  intake to a limited extent; he asserts that, during intake, he informed staff that he had been

16  receiving dental care and needed a tooth filled and that even though he was not currently taking

17  CCCMS medication he was still part of the program and needed to see a psychiatrist.

18  Opposition (Opp.), filed December 4, 2003, p. 2.  Plaintiff contends that prior to his transfer to

19  HDSP, a Mule Creek State Prison dentist determined that follow up treatment for a possible

20  cavity was necessary and that plaintiff should have the receiving institution refer him to a dentist

21  upon his arrival.  <u>Id.</u>, pp. 2-3.  Plaintiff does not note within his medical records any exhibit in

22  support of his assertions.  The cavity was not filled at Mule Creek State Prison (MCSP) because

23  plaintiff was pending transfer.  <u>Id.</u>, p. 3.  Not until more than 12 months later, on July 17, 2000,

24  was plaintiff seen by HDSP dental staff when his # 15 molar was given a filling.  <u>Id.</u>, citing

25  defendants' exhibit, MR, p. 275, which confirms the date of the filling, noting deep decay.

26  \\\\\

1          Because plaintiff cites no evidentiary basis for his contentions and the court's

2   review of plaintiff's previously submitted exhibits in opposition to prior motions does not reveal

3   a basis for plaintiff's contention with respect to his dental condition upon intake at HDSP, his

4   recollection of the events upon intake are only hearsay.   However, even assuming that plaintiff is

5   correct, plaintiff has not shown that defendants in not filling a cavity until a year or slightly more

6   after his transfer have shown deliberate indifference to a serious medical condition.   The Ninth

7   Circuit recognizes that "dental care is one of the most important medical needs of inmates."

8   Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) [citation omitted].  While "the Eighth

9   Amendment requires that prisoners be provided with a system of adequate dental care," id., citing

10  Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir, 1982), "....delay in providing a prisoner with

11  dental treatment, standing alone, does not constitute an Eighth Amendment violation."   Id.,

12  citing Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985).

13         Within his amended complaint, plaintiff alleges that defendant Parks, "head of the

14  dental department" at HDSP failed to see him within fourteen days of his arrival at HDSP, as

15  required by (CDC) policy, review his dental records, and work up a treatment plan, if one was

16  necessary.  Am. Cmpl., p. 6.  Plaintiff states that dental staff at Mule Creek had scheduled "minor

17  dental work" but before performing it, plaintiff was transferred.  Id.   Plaintiff alleges that

18  defendant Parks' failure to do the 14-day work up resulted in a delay of a year and a half  in

19  treating what had been a minor problem but became a major one due to the delay.   Id.   Plaintiff

20  alleges that in the intervening months, he complained about sensitivity and intermittent pain and

21  defendant's refusal to follow procedure resulted in his unnecessary pain and suffering.  Id.

22         From the point of intake to the treatment of the problem which was performed by

23  a non-defendant, Dr. B. Hoag,[14] fourteen months elapsed (not a year and a half).   While

24  defendant may have failed to comply with departmental policy in not doing a work-up of

25  _____

26      [14] MSJC, pp. 10-11, Lee Decl., ¶ 24, MR, p. 275.

1 plaintiff's dental condition within two weeks of plaintiff's arrival at HDSP, while arguably

2 negligent, does not constitute an Eighth Amendment violation.  Plaintiff himself concedes that

3 the problem at the outset was minor.  Nor, as noted, does plaintiff point to exhibits demonstrating

4 that he had informed defendants of the sensitivity and occasional pain he suffered.   Plaintiff's

5 characterization of the problem as having become "major" by the time of treatment does not

6 constitute an expert opinion in support of a finding that his need for a filling constituted a serious

7 medical condition.  Plaintiff complains of some discomfort caused by the delay of treatment but

8 even his allegations do not set forth any basis for a finding that he suffered to such a degree by

9 the delay that defendant Parks can be said to have shown deliberate indifference to a serious

10 medical (or dental) condition.   What plaintiff has, at best, demonstrated is that he was subject to

11 delayed treatment for a condition that he himself characterizes, at least at the outset, as "minor."

12 The court will recommend that summary judgment be granted to defendant Parks.

13         <u>Defendant Lett</u>

14         Within the amended complaint, plaintiff Capogreco alleges that defendant Lett

15 prescribed Depakote for plaintiff, then refused to renew the prescription causing plaintiff to

16 suffer three seizures.  Am. Cmpl., p. 4.  The drug's manufacturer/Physician's Desk Reference

17 warns that taking a patient off Depakote "cold" may cause seizure for those prescribed 25 mg or

18 more; at the time, plaintiff was taking 2000 mg. <u>Id.</u>   Defendant Lett refused to order blood

19 work to test for any liver damage caused by the medication. <u>Id</u>.   Despite plaintiff's requests

20 about any problems related to taking Depakote, defendant Lett did not provide information

21 relating to this issue, nor did he obtain plaintiff's informed consent before prescribing the drug.

22 Am. Cmpl., p. 5.  Defendant Lett "attempted to incite a physical and verbal confrontation" with

23 plaintiff, which caused security problems as well as severe mental stress to plaintiff, which stress

24 plaintiff should avoid do to his "severe organic and non-organic brain disorders." <u>Id.</u>

25         Because there is no dispute that plaintiff suffers from a mental condition or

26 conditions, the court will not recount his medical history on this issue in detail.  As early as May

23, 1985, plaintiff had been diagnosed as suffering from various mental disorders; defendants note that as of December 8, 1994, psychiatrists concluded that plaintiff had a severe mental disorder, chronic bipolar disorder, and an antisocial personality disorder.  Opp., pp. 5-6, Lee Decl.,  ¶ 12, MR, pp. 294,[15] 297-342.  A Dr. Sheppard prescribed 500 mg of Depakote as far back as 1994.  Lee Decl., ¶ 12, MR, p. 294.  In a July 6, 1998 assessment noting his CCCMS (clinical case management) placement, plaintiff was described as bipolar and suffering from paranoia. Lee Decl., ¶ 12, MR, pp. 351-354.   Plaintiff was discharged from the mental health treatment program he had been in at MCSP on May 19, 1999.   Lee Decl., ¶ 12, MR, pp. 292, 389.

Upon his transfer to HDSP, there is no dispute that plaintiff made a number of requests to be seen by a psychiatrist. Lee Decl., ¶ 12, MR, p. 387.   It is noted, on August 6, 1999, in his medical records that plaintiff had made "multiple requests" to be seen, but was a "no-show" on that date; on August 10, 1999, plaintiff missed a psychiatric interview apparently due to a housing move.  MR, p. 387.

Plaintiff submitted a 602 appeal log. number B 99-02226, dated September 13, 1999, wherein he states that sick call requests for psychiatric care in May and June of 1999. 2002 opp. exh. G.  He also put in a request following a July 31, 1999 move from Facility D to Facility B.  Id.  Plaintiff writes that he was seen in the second week in August by someone in mental health, but the doctor could do nothing for him because he did not have his medical file and plaintiff was told he would be seen again in two weeks.  Id.  When plaintiff, on September 13, 1999, asked an M.T.A. why he had not received medical care, he was told that he had been called for two weeks earlier but had refused.  Id.  Because there was a lockdown at the time of the alleged refusal, plaintiff asked building staff who said they did not recall an M.T.A. calling for plaintiff or that plaintiff had ever refused to go anywhere.  Id.  Plaintiff complains that he has received no medical or mental health attention since May of 1999 despite his requests.  Id.

---

[15] Defendants and Dr. Lee mistakenly refer to page 194, rather than page 294 of the MR.

1     Defendants assert that plaintiff was seen on October 1, 1999 by defendant Lett,

2 "after some missed appointments" (which are not explained); no reference is made to any

3 abortive mid-August 1999 visit to which plaintiff refers. Lee Decl. ¶ 12, MR, pp. 372, 384, 386.

4 No particular explanation is provided by defendants for their failure to provide a psychiatric

5 interview for plaintiff prior to October, 1999, despite his many requests, nor is there any

6 explanation for his apparently not having been seen by a psychiatrist within 72 hours of his

7 having been screened upon transfer.  Plaintiff claims that he was denied mental health treatment,

8 despite his appeals for almost four months.  Opp., p. 5.  However, plaintiff's allegations against

9 defendant Lett, as noted, focus on other issues.

10     On October 1, 1999, defendant Lett noted plaintiff's history of bipolar disorder

11 and prescribed 500 mg of Depakote (which plaintiff had been off of since three weeks prior to his

12 transfer to HDSP on May 26, 1999).  Lee Decl., ¶ 20, MR, pp. 384, 386.  On October 13, 1999,

13 plaintiff was placed in HDSP's mental health program, so plaintiff's bipolar disorder, stress and

14 anger management could be monitored and treated.  Lee Decl., ¶ 12, MR, pp. 350, 358, 368, 371-

15 373, 375, 378-384, 465-467.  Plaintiff was prescribed Depakote/Divalproex from October 1,

16 1999 onward.  Lee Decl., ¶ 12, MR, pp. 4-6, 8-9, 11-13, 16-18, 102-111, 371.

17     As to plaintiff's allegation that defendant Lett did not obtain his informed consent

18 before prescribing Depakote, defendants observe that plaintiff signed a consent form or waiver

19 with respect to this medication, provided by another physician earlier, on February 10, 1998.

20 MR, pp. 99, 474.   Plaintiff does not dispute that he had signed an earlier waiver; plaintiff's claim

21 that he was deprived of adequate medical care on the ground that defendant Lett failed to require

22 another waiver as to the same medication is not supportable.

23     Once plaintiff was prescribed 500 mg of Depakote on October 1, 1999 for 90 days

24 or until December 29, 1999,[16] the prescription was renewed by defendant Lett on December 7,

25

26     [16] Dr. Lee mistakenly calculates the year as 2000, rather than 1999,

18

1  1999,[17] which covered the time from December 8, 1999 until February 8, 2000; Dr. Mericle, not

2  a defendant, renewed the prescription on February 9, 2000, covering the period of time from

3  February 10, 2000 through May 10, 2000, which was continued through May 15, 2000 by Dr.

4  Rhee who renewed the prescription from May 16, 2000 through November 12, 2000;[18] defendant

5  Lett renewed the prescription for 30 days on November 9, 2000 and Dr. Rohlfing, not a

6  defendant, continued the prescription from November 27, 2000 through May 27, 2001.  Lee

7  Decl., ¶ 20, MR, pp. 5, 8-9, 11-13, 16-18, 108-109, 102-105, 110-111, 372, 377, 384, 386, (The

8  amended complaint was filed on March 7, 2001).  The record also does not demonstrate that

9  defendant Lett refused to renew the Depakote prescription, leading to plaintiff's having suffered

10 three seizures.   While Dr. Lee attests that there were two short gaps of time when the Depakote

11 prescription ran out before it was renewed, between February 8, 2000 through February 9, 2000,

12 and between May 16, 2000 and May 17, 2000, he nevertheless asserts that plaintiff's three

13 alleged seizures could have only occurred in the February, 8-9, 2000 gap time frame, for which

14 he declares there is no record.  Lee Decl., ¶ 20, MR 367, 472-473.  Defendants seek to make the

15 point, however, that no physician discontinued the medication.  MSJC, p. 9, n. 3, citing MR 367,

16 472-473.

17       In a memorandum by Chief Psychiatrist Minn (not a defendant), dated April 16,

18 2001, Dr. Minn states that there is no evidence in plaintiff's medical files that defendant Lett or

19 any other doctor ever discontinued plaintiff's Depakote or that plaintiff ever suffered three

20 seizures.  Lee Decl., ¶¶ 20, 23, MR, pp. 472-473.  He writes that plaintiff refused to see

21 defendant Lett after the first interview.  Some confusion arises from the timeline Dr. Minn sets

---

22
23       [17] On December 7, 1999, at plaintiff's request that his dosage of Depakote be increased
      and due to plaintiff's "hyper" state, defendant Lett increased the dosage from 500 mg to 1000 mg
24    for 60 days.  MSJC, p. 10, Lee Decl. ¶ 23, MR, pp. 17, 373.

25       [18] A prescription for Depakote/Divalproex was prescribed for 90 days by Dr. Rhee on
      August 14, 2000, which would have been the time that a 90-day prescription from May 16, 2000
      would have run out.  MR, pp. 11-12.  The prescription on August 14, 2000 indicates a
26    prescription for seizure.  MR, p. 11.

forth.  He first indicates that Dr. Rhee, not defendant Lett, first prescribed 2 tablets daily of 500

mg of Depakote for 90 days on August 14, 2000 for seizure disorder.  He then states that "[t]hen

Dr. Lett saw Mr. Capogreco on 10/1/99...."   In the first place, of course, October of 1999

obviously precedes August 14, 2000; in the second place, to say that Dr. Rhee first prescribed

plaintiff the Depakote (assuming the year Dr. Minn meant to insert for this event was 1999, not

2000) does not square with the facts as set forth by defendants and their declarant, Dr. Lee, who

indicate that plaintiff's first Depakote prescription at HDSP came from defendant Lett, not Dr.

Rhee.  Third, Dr. Minn makes no reference to at least a second meeting between defendant Lett

and plaintiff, the December 7, 1999 event, wherein defendants aver that plaintiff sought to have

his Depakote dosage increased and plaintiff alleges that he and defendant Lett wound up in a

confrontation.  Dr. Minn also notes that Depakote has a dual treatment function: for seizure

disorder and for bipolar disorder.  Finally, Dr. Minn says in his memorandum that he knows of

no other specific complaint against defendant Lett other than that arising from plaintiff, but

nevertheless observes that, on March 14, 2001, he gave defendant Lett " a letter of instruction

requesting improvement of his performance."  MR, pp. 472-473.

In plaintiff's 2001 opposition to defendants' first motion to dismiss (vacated by

order filed on February 4, 2002) as well as his opposition to the second such motion, plaintiff

included as part of Exhibit C, an appeal, log no. 00-006677, dated February 8, 2000 (and

evidently incorrectly stamped by the prison as having been received on February 11, 1999, rather

than 2000), stating that defendant Lett, in retaliation for plaintiff's having filed a 602 appeal as to

Lett's alleged misconduct on December 7, 1999, had refused to renew plaintiff's prescription for

2000 mg of Depakote daily on that date (presumably two doses of 1000 mg daily), February 8,

2000.  2001 opp. exh. C and 2002 opp. exh. C.  Plaintiff further states that his prescription cannot

be discontinued without causing severe health risks.  However, he does not complain therein that

he had any seizure as a result of the suspension of the prescription.  Nor does plaintiff

specifically state that he suffered a seizure as a result of the interruption on February 8, 2000 by

1    the time he submitted his third level appeal on December 7, 2000.

2            On the other hand, plaintiff also submitted a health care request form, dated

3    February 8, 2000 (and also mis-stamped by HDSP as received in the year 1999, rather than on

4    Feb. 11, 2000), wherein he has checked "seizure" as one of the conditions for which he seeks

5    treatment. 2002 opp. exh. C.   Plaintiff claims in his opposition to have suffered seizures due to

6    inadequate medical treatment, but that the fact that medical department has not entered

7    information related to his having had seizures in his medical file is a matter over which he has no

8    control.   Opp., p. 3.   Plaintiff alleges that there is evidence in the log book of the housing unit

9    officers that he has had seizures, but that he has not had the opportunity to complete discovery

10   and obtain log book copies. Opp., pp. 3-4.   However, the court gave plaintiff ample opportunity

11   to provide additional information, in the form of exhibits and affidavits, in support of his

12   opposition, filed on December 4, 2003.  See Orders filed on January 28, 2004 and October 13,

13   2004.  Plaintiff cites CDC 128G chrono purportedly at page 275 of his medical records (in

14   defendants' Exhibit 1), wherein HDSP medical staff state that he has a seizure problem;

15   however, the page he identifies describes a dental condition without reference to a seizure

16   problem and on the very next page among the conditions which are marked as not applying to

17   plaintiff is "seizure disorder."  MR, pp. 275-276.   Further, the court's review of plaintiff's

18   exhibits to his 2001 and 2002 oppositions does not reveal the existence of such a chrono, nor

19   does the plaintiff assist the court by identifying the date of the alleged chrono or attaching a copy

20   to his opposition to the pending motion.  Plaintiff states that according to the 1990 edition of a

21   report identified by plaintiff as the Consumer Reports Book Drug Information for the Consumer,

22   depakote should not be stopped without first checking with one's physician, who "may want" to

23   reduce the amount gradually because stopping "suddenly... may cause seizures."  Opp., p. 4.  The

24   quotation marks are applied by the court quoting plaintiff's text, not another source).  Id.   This

25   purported caution is both general, vague, conditional and unsupported by plaintiff with an actual

26   exhibit.

1    Finally, plaintiff alludes to Dr. Rhee's having placed plaintiff back on Depakote in

2    November, 2000 due to a phone call from MTA Bates to the on-call physician when plaintiff

3    "reported having suffered a seizure to MTA Bates due to Dr. Lett's refusal to issue/renew

4    Depakote." Opp., p. 4.  This simply does not make sense.  In the first place, the records shows

5    that plaintiff's complaint relates to having been deprived of Depakote for the brief period of time

6    from February 8 through February 9 or February 10 of 2000, many months before November of

7    2000, a period of time for which there is no support for plaintiff's having been deprived of

8    Depakote.  In the second place, plaintiff does not state that non-defendant MTA Bates actually

9    witnessed any seizure plaintiff may have suffered, but only that he acted on plaintiff's

10   representation of having suffered one.  Finally, plaintiff submits no affidavit from non-defendant

11   MTA Bates, or any other exhibit, in support of his allegation.  On May 18, 2001, a psychiatric

12   social worker notes that plaintiff was "receiving Depakote through medical for reported seizures

13   pending further neurologic testing."  MR, p. 357.   Such notations indicate that it is plaintiff, but

14   no medical expert, who avers that he actually suffered seizures.  Other than plaintiff's complaints

15   and appeals of having suffered seizures as a result of retaliatory actions by defendant Lett, there

16   appears no record in support of plaintiff's allegation that has been presented to this court and no

17   expert evidence in support of plaintiff's claim.

18   The references to "seizure" in plaintiff's medical file do not substantiate that

19   plaintiff actually suffered any. Lee Decl., ¶ ¶ 15-16.  In a letter dated January 4, 2001 addressed

20   to the California Health Services Department plaintiff claims that he suffered three seizures

21   because defendant Lett removed his medication suddenly.  MR, p. 476.  Plaintiff is not specific

22   therein as to the date(s) on which the removal and seizures occurred.   In the April 16, 2001

23   response by Drs. Minn and Sandham (Sandham is a defendant), it is noted that there is no

24   evidence in his medical file that he ever had three seizures or that he had been brought to medical

25   attention for that reason, which should have occurred if he had suffered them . MR, p. 473.

26   \\\\\

1          On June 12, 1999, plaintiff was given a lower bunk, lower tier and a light duty

2    medical chrono due to unequal leg length and back pain.  MR, p. 224.  He was designated not

3    eligible for food handling because of "seizure."  Id.  Dr. Lee notes that there is no further

4    notation as to the date of any seizure or the source of the information claiming a seizure.  Lee

5    Decl., ¶ 16.  Plaintiff, in his opposition, offers no evidence in support of his contention that he

6    was "prone to seizures"; he states that he was denied food handling clearance due to "possible

7    seizures," but point to no specific evidence that would form the basis for such a conclusion.

8    Opp., p. 3.  On April 18, 2000, plaintiff told a psychiatric social worker that he had had a seizure

9    because defendant Lett had not tapered him off Depakote and claimed that Dr. Mericle had

10   placed him back on Depakote.  MR, p. 367.  On July 6, 2000, in another interdisciplinary

11   progress note, plaintiff informed a psychiatric social worker that he received "automatic renewal"

12   of seizure medication.  MR, p. 364.  It was noted that on May 16, 2000, Dr. Rhee had prescribed

13   Depakote for 90 days.  Id.  In another interdisciplinary progress note, dated November 1, 2000, it

14   was noted that Dr. Rhee had prescribed Depakote on August 14, 2000 for "90 days for seizure."

15   MR, p. 363.  Defendants contend that there is no indication whether the medication was

16   prescribed to prevent potential seizures or based on plaintiff's claim of having suffered seizures

17   and that Depakote was also used to treat plaintiff's bipolar disorder.  Lee Decl., ¶ 16.  On

18   February 21, 2001, in another interdisciplinary progress note, the psychiatric social worker notes

19   that plaintiff was receiving "seizure meds from medical."  MR, p. 362.  Defendants contend that

20   seizure medication came from medical, rather than psychiatric, staff.  Lee Decl., ¶ 16.  The

21   court notes that there is at least one additional reference in plaintiff's medical file mentioning the

22   word "seizure" in an August 14, 2000 prescription by Dr. Rhee for 90 days of 500 mg of

23   Depakote "for seizure."  MR, p. 11.  Otherwise, the references to seizures appear to arise as a

24   result of reports by plaintiff of having suffered them.  Lee decl., ¶¶ 15-17, MR No report

25   indicates that plaintiff actually suffered a seizure for which he was treated by any physician.

26   Nothing exists to indicate the basis for Dr. Rhee's reference, whether he was acting on a report

by plaintiff or on whether he actually diagnosed plaintiff as ever having suffered one, or whether he was simply taking a precaution.  Plaintiff simply does not present enough evidence to counter defendants' showing that there is no genuine issue of material fact as to the question of plaintiff having suffered a seizure as a result of retaliatory action by defendant Lett.

As to plaintiff's complaint that defendant Lett was hostile to him on December 7, 1999 at which point his Depakote was discontinued abruptly by the defendant causing plaintiff's seizures, plaintiff presents no expert medical evidence to counter the evidence produced by defendants.  In an appeal, log no. HDSP-B-00-00422, filed on February 6, 2000, plaintiff asserts that he saw defendant Lett on December 7, 1999 because he was having "adjustment and anger management problems," at which time defendant Lett was hostile and confrontational, seeking "to elicit a verbal and/or physical response" from plaintiff and refusing to discuss plaintiff's medication dosage with him, and stating that if plaintiff did not like it, he should "sue the governor."  MSJC, Exh. 2.  Defendants concede that plaintiff has a personality conflict with defendant Lett, at least from plaintiff's perspective. Lee decl., ¶ 13, MR, pp. 362, 364-367, 472-473.  Defendant Lett's own notes of the December 7, 1999 encounter with plaintiff makes no reference to Lett's own conduct, but states that plaintiff was "very hyper today," was seeking an increase in his Depakote dosage, was barely able to sit and spoke in a "rapid" and "high-pitched voice." Lee Decl., ¶ 23, MR, p. 373.   Defendant also notes that an increase in plaintiff's "medication is probably indicated." MR, p. 373.   Plaintiff's medical record indicates he was dealing with stress and anger management issues prior to the incident. Lee Decl., p. 23, MR, pp. 379-384.  Plaintiff, himself, states that his adjustment and anger problems were what prompted his seeing defendant Lett that day in the first place.  There is no indication that plaintiff's dosage was discontinued by defendant Lett.  In fact, the record indicates that plaintiff's dosage of Depakote was increased by defendant Lett to 1000 mg twice a day for 60 days on December 7, 1999. Lee Decl., ¶ 23, MR, p. 17, 371.  Even assuming defendant Lett was angry or hostile with

\\\\\\

24

1   plaintiff, such an allegation by itself, cannot rise to the level of an Eighth Amendment violation.[19]

2   On January 19, 2000, plaintiff told a psychiatric social worker that he was taking

3   Depakote for poor coping, poor impulse control and mood swings. Lee Decl., ¶ 23, MR 371.

4   Plaintiff also indicated that he was unhappy with defendant Lett and had "602'd him." Id.   The

5   psychiatric social worker describes plaintiff's demeanor as "very intimidating, demanding and

6   entitled." Lee Decl., ¶ 16, MR 371.  On January 28, 2000, plaintiff refused to keep a mental

7   health appointment.  Lee Decl, ¶ 23, MR, p. 369.  On April 18, 2000, plaintiff complained to a

8   psychiatric social worker that defendant Lett had "made him mad." Lee Decl, ¶ 23, MR, p. 367.

9   According to plaintiff, defendant Lett had not tapered off his Depakote prescription, resulting in

10  his having had seizures.  Id.

11  Plaintiff advises the court to review the Physician's Desk Reference PDR) box

12  warning for Depakote (a copy of which page he does not include as an exhibit). Opp., p. 4.  The

13  court's review of that PDR text in the 1999 edition indicates in patients with epilepsy a loss of

14  seizure control may occur.   PDR, p. 424.  (Neither plaintiff nor his medical records suggest that

15  he suffers from epilepsy).

16  It is also stated that "[l]iver function tests should be performed prior to therapy

17  and at frequent intervals thereafter, especially during the first six months." Id.   Particular

18  warnings are directed to the prescribing of Depakate or Divalproex for children under two years

19  of age. PDR, p. 23. Plaintiff complains that defendant Lett did not order a liver panel and that

20  this does not comport with accepted medical practice; he also notes that he suffers from Hepatitis

21  C.  Opp., p. 4.  Dr. Lee states that liver panels would normally have been ordered by medical

22  doctors, who continued to renew the Depakote prescription after defendant Lett ordered the

23  initial prescription.   Lee Decl., ¶ 21.  Dr. Lee's review of plaintiff' medical files revealed

24  nothing to indicate that plaintiff prevented with symptoms during the time that defendant Lett

25

26  [19]  Of course, it is much more likely that the mental problems afflicting plaintiff colored
his perceptions of the actions of other people.

25

1   prescribed Depakote from October 1, 1999 through February 7, 2000. Id.   Moreover, in a

2   second level appeal response, log no. HDSP-B-00-00422, plaintiff was informed by (non-

3   defendant) Dr. Rholfing, that his liver was "okay" in an interview with him on November 21,

4   2000. Id., citing Exh. 2.  The actual text of the response states that Dr. Rohlfing told plaintiff

5   that his review of plaintiff's lab results indicated that plaintiff's liver was "okay though [his]

6   bilirubin is elevated slightly." Id.   In addition, Dr. Lee notes that the medical records indicate

7   that plaintiff's Hepatitis C condition was monitored by HDSP medical staff with retesting on

8   9/22/99, 9/30/99,[20] 2/12/00, and 4/11/01.  Lee Decl., ¶ 11,  MR, pp. 22, 49, 161-162, 165-167,

9   169-170, 424.

10          Plaintiff, on the other hand, points to no expert medical opinion in support of his

11   allegations against defendant Lett.  Neither does he demonstrate that defendant's actions were

12   "criminally negligent," particularly in the face of the medical record indicating that plaintiff's

13   Depakote prescription was never discontinued for the relevant period by any doctor, including

14   defendant Lett.  While treatment of plaintiff in the prison milieu was probably less than

15   optimum, this is a far cry from deliberate indifference.  Judgment should be entered for defendant

16   Lett.

17                      Defendants Sandham and Gilkes

18          Plaintiff alleges that both defendants Sandham and Gilkes are the acting Chief

19   Medical Officer, and that each is responsible for HDSP's medical department and for the

20   procedures determining when an inmate is to be seen by medical staff.  AC, pp. 1, 2.  Plaintiff

21   alleges that upon his having been received at HDSP, he informed medical staff that he had "had a

22   possible problem with seizures and a degenerative back and foot problem and needed to be seen

23   by medical staff," which was not done.  Id.  As a result, plaintiff suffered "constant pain in his

24   lower back and mobility problems."  Id.  Defendants Sandham and Gilkes were  responsible for

25

26          [20] Any evaluation or retest done on September 30, 1999 is the only date for which the
      court could find no confirmation in the portions of the medical records cited.

1  authorizing the special lifts plaintiff needs to correct his back and foot problems.  Id.  Defendants

2  Sandham and Gilkes were also responsible for assuring that newly arrived inmates are seen by

3  medical staff if a seizure problem is noted.  AC, pp. 1, 3.  Defendants Sandham and Gilkes did

4  not issue the authorization plaintiff needed for his "medical appliances" for over a year.  AC, pp.

5  1, 2-3.

6        As noted, plaintiff was transferred to HDSP on May 26, 1999.  Defendants

7  contend that plaintiff's back and foot problems were monitored by medical staff and he was

8  granted a lower tier, lower bunk, light duty medical chrono, on June 12, 1999, about two weeks

9  after his arrival, based on his back/leg conditions.  Lee Decl., ¶ 11, MR, p. 224.  Plaintiff was

10  issued medical chronos permitting him to wear Red Wing crepe sole shoes and orthotic shoe lifts

11  on 9/15/99, 1/26/00, 5/19/00, 8/31/00, 4/26/01, and 6/20/01.  Lee Decl., ¶ ¶ 11, 19, MR, pp. 3,

12  19, 49, 55-56, 58B, 58, 221.   Both defendants Sandham and Gilkes signed the September 15,

13  1999 chrono, authorizing plaintiff's use of Red Wing boots with orthotics.  Lee Decl., ¶ 19, MR,

14  p. 224.   The court notes that on December 9, 1999, his medical records indicate that plaintiff was

15  granted a priority on the podiatry line re: lifts in a physician's order.  MR, p. 17.  "Red Wing

16  outside boots" were also noted on October 13, 1999 as approved in a physician's order.  MR, p.

17  18.

18        Plaintiff was seen on the podiatry line on February 10, 2000 by a (non-defendant)

19  Dr. Knedge Hicks.   Lee Decl., ¶ 19, MR, p. 58.   On his August 31, 2000 progress record, it was

20  noted that plaintiff's orthotics fit well[21] and did not need to be replaced.  Lee Decl., ¶ 19, MR, p.

21  56.  Defendant Sandham renewed the boot chrono[22] on April 26, 2001.  Lee Decl., ¶ 19, MR, pp.

22  221-222.  Dr. Lee observes that plaintiff was seen more frequently by Drs. Rohlfing and Rhee

23  than by defendant Sandham.   Lee Decl., ¶ 19.   Dr. Lee avers that any of these physicians could

24        [21] The notes actually state that the orthotics "seemed" to fit well and did not need to be
25  replaced.

26        [22] The chrono was for "crepe sole boots."

27

1   have issued a chrono for lifts if such was determined to be a medical necessity or if the ones

2   plaintiff already had had been found to be inadequate.  Lee Decl., ¶ 19.  Neither defendants nor

3   plaintiff points to an entry in his progress notes that appears to be dated January 26, 2000 and

4   states that plaintiff "still has not gotten the boot & orthotic....", which, inter alia, appeared to

5   have been ordered.  MR, p. 58.  Dr. Lee does state, however, that there is no evidence in the

6   medical file that indicates that any delay in issuing a medical chrono caused plaintiff medical

7   injury.  Lee Decl., ¶ 19, MR generally.   Dr. Lee was unable to discover any description in

8   plaintiff's medical record to indicate that his back and foot conditions were "degenerative." Lee

9   Decl., ¶ 18, MR generally.

10          In his opposition, plaintiff has modified his allegation against defendants

11   Sandham and Gilkes to the extent that he states that approval for the lifts and Red Wing boots

12   took over four months (as opposed to more than a year).  Opp., p. 5.  Plaintiff notes that his

13   medical records indicate the need for special lifts and shoes as far back as 1978.  Id., citing MR,

14   p. 261.  Plaintiff argues that the lifts and Red Wing boots he needed were denied pending

15   approval for the four-month period even though doing so would exacerbate his medical

16   condition, including increasing his pain and causing degeneration of his back condition.  Opp., p.

17   5.  Plaintiff further contends that on June 15, 1993 a CT scan was performed and radiology

18   reports showed a lower back problem with "'probable nerve root encroachment, secondary to

19   disc disease.'" Opp., p. 6, MR, pp. 198-201, 249.  The court notes that what plaintiff does not

20   point out was that the above comment was noted as an "impression" on April 16, 1993, prior to a

21   CT scan that was performed in June of 1993.  Also not cited by plaintiff is the June 24, 1993

22   followup, which evidently was reported to plaintiff by Dr. Gregory Duncan:

23              Myelogram and CT scan were reviewed.  There was some mild
               disc bulging at L4-5 and L5-S1, but no restriction of dye flow or
24              cut-off of the sleeve of the nerve root.  CT scan showed no
               significant abnormalities and the bone scan was cold.
25              IMPRESSION & PLAN: MECHANICAL LOW BACK PAIN
               WITHOUT NEUROLOGIC DEFICIT OR ANY EVIDENCE OF
26              NEUROCOMPRESSION.

> I recommend lumbar support to be used intermittently when he is
> working or exercising.  He may be released to full duty as tolerated
> and to return to clinic in about 3 months for final check, no new X-
> rays.

MR, p. 248.

According to plaintiff, on October 14, 2003, Salinas Valley State Prison staff ordered a new MRI which showed plaintiff's lower back problem had substantially worsened with the need for possible back surgery.   Opp., p. 6.   Plaintiff cites to and includes no exhibits in support of this contention, but he does aver that defendants' treatment or lack of same contributed to the alleged degeneration of his back condition.  Id.

Plaintiff's evidence, either incomplete or insufficient, does not dispute a genuine issue of material fact that the delay he endured (a delay which plaintiff has acknowledged was four months in length rather than the more than one year initially alleged) before obtaining the approval of defendants Sandham and Gilkes for new Redwing crepe sole boots or orthotics did not constitute deliberate indifference to the medical condition of his back, leg and foot.  Nor does plaintiff demonstrate how only these two defendants could issue a medical chrono for the boots and lifts.  It has already been noted that plaintiff has not sufficiently disputed defendants' evidence that intake staff were not informed of a "possible" seizure condition suffered by plaintiff, thus defendants Sandham and Gilkes cannot be found to have been deliberately indifferent in failing to assure that plaintiff was seen by medical staff upon intake or immediately thereafter for this condition.   Finally, even if defendants are responsible for a procedure, and/or compliance with such a procedure, as to when inmate is to be seen by medical staff, plaintiff has not rebutted defendants' evidence that such a delay rose to a constitutional deprivation suffered by plaintiff.   Shapley v. Nevada Bd. of State Prison Com'rs, supra, 766 F.2d at 408.   Summary judgment should be entered for defendants Sandham and Gilkes.

\\\\\

\\\\\

1          Defendant Malan

2          Plaintiff alleges that defendant Malan, a dentist, who is the HDSP Health Care

3    Manager, is responsible for reviewing all medical orders and blood work.   AC, p. 3.  He claims

4    that the Health Care Manager is also responsible for overseeing all medical requests and

5    procedures and approving or disapproving any treatment or procedure.  Id.  Defendant Malan, as

6    a dentist, is unqualified to hold the Health Care Manager position.  Id.  Because defendant Malan

7    is acting "outside of the scope of his license" and does not understand plaintiff's medical

8    problems, he is unable to get the treatment he needs and his life is thereby placed in jeopardy.

9    AC, pp. 3-4.

10          Defendants point out that plaintiff fails to specify what medical condition

11    defendant Malan failed to address properly when he was Health Care Manager and how his life

12    was placed in jeopardy.  Lee Decl., ¶ 25.  Dr. Lee finds no evidence in plaintiff's medical file that

13    defendant Malan ever personally treated plaintiff.  Id.  Defendants' medical expert states that a

14    Health Care Manager assists "in the administration of the institution's health care delivery

15    system."  Id.  Because the function of the Health Care Manager is administrative, any health care

16    professional can serve as a Health Care Manager.  Id.  Medical personnel make the medical

17    decisions and the Health Care Manager "tries to ensure that the process for implementing those

18    decisions is carried out smoothly."  Id.

19          Plaintiff's only opposition applies to defendants Parks, Malan, Castro and Tristan.

20    Opp., p. 6.  Plaintiff contends that he filed numerous 602 appeals to which all of these defendants

21    responded, which signifies that each had direct knowledge of plaintiff's medical problems.

22          Defendants Castro and Tristan

23          Defendant Castro, HDSP Warden, and defendant Tristan, (then) Director of the

24    California Department of Corrections (CDC), were aware of plaintiff's medical problems.  AC,

25    p. 7. Defendant Castro is responsible for ensuring the proper medical treatment of HDSP

26    inmates, and defendant Tristan is responsible for the medical treatment of the entire inmate

1  population of the state, but both have failed to investigate problems or make any necessary

2  changes in the medical treatment provided inmates.  AC, pp. 7-8.  Their refusal to accept their

3  responsibility for the care and treatment of inmates has allowed plaintiff to suffer seizures caused

4  when he was treated by untrained or incompetent medical staff.  Id.

5          Defendants contend that plaintiff's allegations with respect to these two

6  defendants are too general for them to discern precisely what problems plaintiff alleges needed

7  investigating and what changes to treatment would have been necessary.  Lee Decl., ¶¶ 26-27.

8  Defendants assert that there is nothing in plaintiff's medical records that demonstrate that either

9  defendant was personally aware of plaintiff's medical problems or of any improper medical care

10  occurring at HDSP.  Id.  As to defendant Castro, in Dr. Lee's experience, a warden does not

11  make changes to an institution's health care delivery system unless directed to do so by the

12  CDC's Health Services Division or if something specific has happened that has specifically been

13  brought to the attention of warden requiring change.  Lee Decl., ¶ 26.  In such a case, the warden

14  would rely on the advice and expertise of medical staff before implementing any such change.

15  Id.

16          As noted, plaintiff's opposition simply asserts that these defendants had personal

17  knowledge of his particular medical problems as a result of the numerous 602 medical appeals

18  that he filed.

19          As to defendants Parks,[23] Malan, Castro and Tristan, defendants argue that

20  plaintiff's allegations seek to impute supervisory liability upon them and that a supervisory

21  official under § 1983 made be held liable only if he was personally involved in the constitutional

22  deprivation or there was a sufficient causal connection between the supervisor's wrongful

23  conduct and the constitutional violation.  MSJC, p. 17, citing Redman v. County of San Diego,

24  942 F.2d 1435, 1446-47 (9th Cir. 1991).  Plaintiff asserts, as noted, that these defendants were

25

26      [23] The court has previously stated that summary judgment for defendant Parks will be recommended, see discussion, supra.

31

1  personally involved because he directed numerous appeals to them to which they responded,

2  although plaintiff does not identify those appeals herein.  Opp., p. 6.

3              The Civil Rights Act under which this action was filed provides as follows:

4              Every person who, under color of [state law] . . . subjects, or causes
               to be subjected, any citizen of the United States . . . to the
5              deprivation of any rights, privileges, or immunities secured by the
               Constitution . . . shall be liable to the party injured in an action at
6              law, suit in equity, or other proper proceeding for redress.

7  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

8  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

9  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

10 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

11 meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

12 omits to perform an act which he is legally required to do that causes the deprivation of which

13 complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

14             Moreover, supervisory personnel are generally not liable under § 1983 for the

15 actions of their employees under a theory of respondeat superior and, therefore, when a named

16 defendant holds a supervisorial position, the causal link between him and the claimed

17 constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

18 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S.

19 941 (1979).  Vague and conclusory allegations concerning the involvement of official personnel

20 in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th

21 Cir. 1982).

22             However, "[s]upervisory liability exists even without overt personal participation

23 in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself

24 is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"

25 Redman, supra, 942 F.2d at 1447.

26 \\\\\

1    Plaintiff cites no case law in support of the proposition that the processing of his

2    inmate grievances, no matter how numerous, by defendants constitutes their personal

3    involvement in any alleged constitutional deprivation to which he was subject.  Neither a prison

4    official's involvement with processing an appeal, Olim v. Wakinekona, 461 U.S. 238, 249, 103

5    S. Ct. 1741 (1983), nor the failure of an official to process an appeal, Mann v. Adams, 855 F.2d

6    639, 640 (9th Cir. 1988), constitute constitutional violations.   Moreover, plaintiff has not been

7    able to demonstrate that any constitutional violation ever occurred.   Defendants' motion should

8    be granted and judgment entered for these defendants.

9         Accordingly, IT IS HEREBY ORDERED that:

10        1.  Defendants' motions for partial summary judgment as to plaintiff Johnson, re-

11   noticed on October 13, 2004 and October 21, 2004, are vacated;

12        2.  An evidentiary hearing must be set to determine whether plaintiff is being

13   deprived of access to legal materials relevant to this case.

14        IT IS HEREBY RECOMMENDED that defendants' motion for partial summary

15   judgment as to plaintiff Capogreco, re-noticed on October 13, 2004, be granted and judgment be

16   entered for defendants as to this plaintiff and this case proceed only on plaintiff Johnson's

17   claims.

18        These findings and recommendations are submitted to the United States District

19   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20   days after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23   shall be served and filed within ten days after service of the objections.  The parties are advised

24   \\\\\

25   \\\\\

26   \\\\\

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 9/2/05

4                                                    /s/ Gregory G. Hollows
                                          _____
5                                                    GREGORY G. HOLLOWS
                                                     UNITED STATES MAGISTRATE JUDGE
6   GGH:009
    john1951.ofr2
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26